```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
BRAD ROBERTS and STACEY ROBERTS,                              :
                                                              :
                                        Plaintiffs,           :
                                                              :         24 Civ. 8162 (LGS)
               -against-                                      :
                                                              :         **OPINION & ORDER**
                                                              :
PUOPOLO M.D., P.C.,                                           :
                                                              :
                                        Defendant.            :
------------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

Brad Roberts and Stacey Roberts ("Plaintiffs") bring this action against Puopolo M.D., P.C. ("Defendant"), alleging medical malpractice, lack of informed consent, negligent hiring and supervision, and loss of consortium. Defendant moves for summary judgment as to all claims. For the reasons below, Defendant's motion for summary judgment is denied. Defendant's related motion to strike a letter from Plaintiffs as a de facto surreply is granted, and Plaintiffs' request in that letter is denied as moot.

I.  **BACKGROUND**

The following facts are drawn from the parties' statements pursuant to Federal Rule of Civil Procedure 56.1 and other submissions on Defendant's motion for summary judgment. All evidence is construed, and all reasonable inferences are drawn, in favor of Plaintiffs as the non-moving party. *N.Y. State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

In November 2020, Plaintiff Brad Roberts ("Brad") joined LifeMD, Inc. ("LifeMD") as Chief Operating Officer ("COO"). Around that time, Plaintiff Stacey Roberts ("Stacey"), Brad's wife, also began working for LifeMD and ultimately became the director of Patient Care. Non-

party LifeMD is a publicly traded company that sells telehealth services nationwide. LifeMD has contractual relationships with its "affiliated network" of physician-owned professional corporations ("P.C.s") and professional associations ("P.A.s").

Brad formally held the title of COO of LifeMD until March 2024. While Brad was COO, Dr. Anthony Puopolo ("Dr. Puopolo") served as President of all but one of the P.C.s and P.A.s in LifeMD's network, including Defendant.[1] Defendant operates under the trade name LifeMD Western Patient Medical Care, P.C. ("LifeMD Western P.C."), and offers telehealth services to patients living in California, Arizona, Colorado, Hawaii, Idaho, Montana, New Mexico, Utah and Washington.

**A. Brad Roberts' Medical Care**

As LifeMD prepared to market a medication-based weight-management service, Brad began a weekly weight loss program, specifically a GLP-1 regimen, under the care and direction of Defendant. GLP-1s (or Glucagon-like peptide-1 receptor agonists) are injectable hormones originally approved to control blood-sugar levels in Type-2 diabetes; they are now increasingly prescribed off-label for rapid weight-loss therapy. LifeMD used Brad's weight loss as the basis for an advertising campaign seeking to show the efficacy of LifeMD's services in prescribing GLP-1 medication.

Brad's treatment began in November 2022 and continued through November 2023, all while Brad served as COO of LifeMD. The treatment was provided through telehealth

---

[1] Plaintiffs argue that the evidence underlying this assertion is inadmissible hearsay. This assertion is immaterial to the decision on the instant motion for summary judgment, and it is also supported by the sworn Declaration of Dr. Puopolo, who has personal knowledge of his titles during the period in question. *See* Fed. R. Civ. Proc. 56(c)(4) ("[A]n affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

consultations, primarily with Dr. Puopolo who prescribed and managed Brad's weekly GLP-1 treatments.  During Brad's one-year treatment period, Dr. Puopolo prescribed a succession of escalating doses.  Between February 2023 and December 2023, Brad's weight fell from 286 pounds to 177 pounds -- a loss of 109 pounds and an average of approximately 2.4 pounds per week.

By December 2023 Brad began suffering from patulous eustachian tube dysfunction.  By March 2024, he was experiencing equilibrium problems, double and quadruple vision, migraine headaches, tinnitus, tremors, profound fatigue, "holes" in his memory, reduced attention span, slurred speech and pervasive ear and mouth pain.  Brad has undergone "five corrective surgeries (and counting)" as of June 2024, and his "condition remains mostly unresolved."

Two physicians -- Drs. Wilkerson (Brad's treating physician) and Cooper (Plaintiffs' expert witness) -- attested that the GLP-1 regimen prescribed by Dr. Puopolo departed from the standard of care, and Dr. Wilkerson opined that this regimen produced Brad's physical and neuro-cognitive decline.  Treating psychologist Dr. Yadira Báez Lockard opined that Brad's symptoms left him unable to drive more than a few minutes at a time, manage e-mail or bank on his own, stay awake for any appreciable amount of time or make basic life decisions and that from at least December 2023, Brad "could not competently understand, negotiate, or execute legal documents."

**B.  Plaintiffs' Separation from LifeMD**

LifeMD in effect demoted Brad from his COO position in or about January 2024 and cut off both Plaintiffs' access to LifeMD's systems on February 25, 2024, resulting in their de facto termination.  Brad's termination followed an extensive campaign to pressure him to resign for health reasons.

On March 9, 2024, Brad and Stacey each signed an eleven-page Separation Agreement (the "Agreements"), including a release. As consideration, Brad received a $125,000 lump-sum severance payment plus an ongoing "Transition Services Fee" of $40,277 per month for 18 months following the Separation Date (totaling $724,976). Stacey received five months of salary continuation.

### C. Post-Separation Events

Beginning on March 14, 2024, five days after Plaintiffs signed the Agreements, and continuing in April and May 2024, Brad's counsel communicated with LifeMD's counsel, in effect repudiating Brad's separation agreement due to "coercion, duress and overreaching" and attempted to renegotiate it.

On October 28, 2024, Plaintiffs filed this action against Defendant, asserting medical malpractice, lack of informed consent, negligent hiring and supervision and loss of consortium. Before any discovery, Defendant moved for summary judgment, arguing that the broad releases in the Agreements bar all claims. In light of the plain language of the release, discovery was stayed pending resolution of the motion.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate when the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2] *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

4

Cir. 2020). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021). "Summary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023). "The moving party bears the burden to demonstrate the absence of any genuine issues of material fact." *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). "[W]here a movant has shown the existence of a material fact and the nonmovant wishes to challenge it, the nonmovant bears the burden of production to point to 'significant probative evidence' (that is, more than 'a scintilla of evidence') from which a reasonable factfinder could find for the nonmovant." *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 413-14 (2d Cir. 2024) (quoting *Anderson*, 477 U.S. at 249), *unrelated certified question accepted*, 249 N.E.3d 37 (N.Y. 2024). "Demonstrating that such issues exist requires the nonmovant to do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). The nonmovant cannot merely "deny the moving party's allegations in a general way," but instead "must present competent evidence that creates a genuine issue of material fact." *Id.*

New York law governs state law issues in this dispute because the parties assume that it does. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (stating that where the parties' briefs assume that a particular state law controls, "such implied consent is . . . sufficient

5

to establish the applicable choice of law"); *accord Bulgari v. Bulgari*, No. 22 Civ. 5072, 2025 WL 1558355, at *2 (S.D.N.Y. June 2, 2025).

## III. DISCUSSION

### A. Scope of the Release in the Agreements

The first issue is whether the Agreements, by their terms, unambiguously release Defendant from the claims in this case. Whether an agreement is ambiguous is a question of law for the court. *Donohue v. Cuomo*, 184 N.E.3d 860, 867 (N.Y. 2022). "An agreement is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014); *accord Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024) (New York law). On the question of ambiguity, both parties point to materials outside the four corners of the Agreements. But "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 643 (N.Y. 1990); *accord Donohue*, 184 N.E. at 866. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Ellington*, 21 N.E.3d at 1003.

Here, the releases in the Agreements are unambiguous. The Agreements state that each Plaintiff "hereby generally and completely release[s], acquit[s] and forever discharge[s]" LifeMD and the "Company Parties," "including but not limited to its affiliated network of medical professional corporations" from "any and all claims . . . including but not limited to . . . medical negligence and/or malpractice; detrimental reliance; [or] loss of consortium to you or any member of your family" that accrued before March 9, 2024. The undisputed evidence shows

that Defendant, doing business as LifeMD Western, is an affiliated medical professional corporation of LifeMD. The phrase "including but not limited to" in reference to both the released parties and the released claims confirms the broad reach of the release -- encompassing Defendant, and the claims asserted in the Complaint.

Plaintiffs' proposed interpretation -- that "affiliated" means only non-clinical entities (entities that acted "not as prescribers or providers of medical services, but as consultants related to its overall business and operations") -- finds no support in the text and therefore does not create an ambiguity. Plaintiffs' apparent contention that Defendant must prove that Brad and Stacey knew of Defendant's status as an affiliate prior to signing the Agreements is also unfounded.

Plaintiffs concede in their briefing that Defendant can enforce the releases as a third-party beneficiary to the Agreements. *See Levy v. Young Adult Inst., Inc.*, No. 13 Civ. 2861, 2016 WL 6092705, at *22 (S.D.N.Y. Oct. 18, 2016) (non-signatory could enforce release as third-party beneficiary because it was one of the "agents, directors, officers, representatives, and employees" to which the release applied), *aff'd*, 744 F. App'x 12 (2d Cir. 2018). Because Defendant has the right to sue and the releases unambiguously cover the claims pleaded in this suit, summary judgment turns on Plaintiffs' challenges to enforceability.

B.  **Defense to Enforceability -- Brad Roberts' Capacity**

A genuine dispute of material fact exists as to Brad's capacity to contract -- and, therefore, the enforceability of the Agreements signed by Brad. New York law presumes a "party's competence to enter into a contract . . . and the party asserting incapacity bears the burden of proof." *Er-Loom Realty, LLC v. Prelosh Realty, LLC*, 909 N.Y.S.2d 714, 716 (1st Dep't 2010); *accord Whitaker v. Amazon.com Servs. LLC*, No. 22 Civ. 10222, 2024 WL

1076521, at *4 (S.D.N.Y. Mar. 12, 2024) (New York law). "To meet that burden, a party must prove (1) 'that the mind was so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction,' and (2) that the other contracting party 'knew or should have known of his condition.'" *Washington v. NYC Med. Prac., P.C.*, No. 18 Civ. 9052, 2021 WL 918753, at *6 (S.D.N.Y. Mar. 10, 2021) (New York law) (quoting *Ortelere v. Teachers' Ret. Bd. of New York*, 250 N.E.3d 460, 464 (N.Y. 1969)); *see* Restatement (Second) of Contracts § 15(1) (A.L.I. 1981) ("A person incurs only voidable contractual duties if by reasons of mental . . . defect he is unable to understand in a reasonable manner the nature and consequences of the transaction . . . .").

Here, a reasonable jury could find that Brad lacked capacity under New York law. As to the first element, several medical experts opined that Brad lacked the ability to comprehend legal documents around the time he signed the Agreement on March 9, 2024. Dr. Brent Wilkerson examined Brad in March 2024 and stated that "during the evaluation . . . [Brad] exhibited a complete lack of capacity to make any life or business decisions." This assessment was echoed by Dr. Yadira Báez Lockard, Brad's treating psychologist since approximately January 2015 and a practitioner who "regularly treat[s] and evalute[s] patients related to issues of their mental capacity and acuity . . . including . . . whether a patient is able to understand legally significant documents, such as contracts." Dr. Báez Lockard opined that Brad has lacked "the mental capacity to make life decisions of any particular consequence . . . since, at least December 2023." Based on these contemporaneous opinions from medical professionals, a reasonable jury could conclude that Brad lacked mental capacity under New York law.

As to the second element of the defense of lack of capacity to contract, a reasonable jury could conclude that LifeMD had at least constructive knowledge of Brad's incapacity. Dr.

8

Puopolo allegedly contacted Dr. Báez Lockard with concerns about Brad's potential incapacity as early as Fall 2023 -- including concerns that Brad "could not express his thoughts clearly during meetings with other executives, board members, or employees of LifeMD, Inc. . . . and that [Brad] could not understand statements, instructions, or queries presented to him during meetings with other executives, board members, or employees of Life[MD]." Andrea Danielle Brown, LifeMD's Director of Human Resources at the time, stated in her affidavit that, in January 2024, Brad informed LifeMD that he was seriously ill and needed to seek medical attention for his ear. Ms. Brown described various exchanges with LifeMD management that led her to believe that LifeMD sought to push Brad out due to his illness. Brad's treating physicians described Brad's physical symptoms, including slurred speech, shaking, trembling, dizziness and balance issues, at least some of which were visually apparent in March 2024. Based on this evidence, a reasonable jury could find that LifeMD knew or should have known of Brad's incapacity on March 9, 2024.

Defendant is not entitled to summary judgment on its defense that Brad's claims were contractually released. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) ("Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.").

### C. Defense to Enforceability -- Alleged Illegality of the Agreements

While Brad's capacity arguments do not reach Stacey's Agreement, Plaintiffs raise a different issue regarding the enforceability of both releases -- whether the Agreements operate, in substance, as undisclosed malpractice settlements devised to evade mandatory reporting to the National Practitioner Data Bank ("NPDB") and state health agencies. It is well settled in New York that "[a] party to an illegal contract cannot ask a court of law to help him carry out his

9

illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." *Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948); *accord Bonilla v. Rotter*, 829 N.Y.S.2d 52, 53 (1st Dep't 2007).  In *Ash v. New York University Dental Center*, the First Department voided a release that prospectively exculpated a dental clinic and its providers from malpractice liability, reasoning that such provisions are "in violation of public policy and should not be enforced."  564 N.Y.S.2d 308, 309 (1st Dep't 1990); *id.* at 310-11 (explaining that the "State carefully regulates the licensing of physicians and other health care professionals . . . to prevent untoward consequences to the public").  Similarly, in *Mercado v. Schwartz*, a Suffolk County court invalidated contractual restrictions on a patient's right to pursue a malpractice claim as against public policy.  92 N.Y.S.3d 582, 590-91, 597 (Sup. Ct., Suffolk Cnty. 2019), *aff'd*, 174 N.Y.S.3d 82 (2d Dep't 2022).

   If Plaintiffs can show that the Agreements were, in effect, medical malpractice settlements that circumvented reporting requirements, the releases may be unenforceable. Medical malpractice settlements are subject to federal and state laws, which require the reporting of the settlement's nature, the name of the physician and his employer, the consideration paid and the circumstances of the alleged medical malpractice.  *See, e.g.*, 42 U.S.C. § 11131(a); *id.* § 11131(b)(1)-(7) (requiring reporting of any payments in settlement or satisfaction of a judgment related to medical malpractice to the NPDB); N.Y. Ins. Law § 315 (requiring reporting of all settlements or judgments based on physician negligence); Cal. Bus. & Prof. Code § 801.01(a) (requiring reporting of arbitration awards or civil judgments of any amount and of malpractice settlements over $ 30,000).  These disclosure requirements are intended to help protect the public and alert medical licensing authorities so they can take appropriate action following credible allegations of misconduct.  *See* National Practitioner Data Bank for Adverse

10

Information on Physicians and Other Health Care Practitioners; Final Regulations, 54 Fed. Reg. 42,722, 42,726 (Oct. 17, 1989) (describing the NPDB's statutory purpose). As such, reporting requirements can cause significant professional ramifications, which may incentivize physicians and their employers to find ways to circumvent them. *See* Alice G. Gosfield, *Medical Practice Act and NPDB Reporting: Trends and Implications for Physicians and Hospitals*, 2021 Health L. Handbook 16 ("Broader examinations and studies . . . suggest that there has long been resistance to reporting within health care despite the systems in place designed to promote reporting for the protection of the public and advancement of quality."); Farid Gharagozloo et al., *The Health Care Quality Improvement Act and the National Practitioner Databank: Constitutional Violations and Preservation of Civil Rights for Physicians*, 8 Mathews J. Case Rep. 93 (2023) ("[H]ospitals and employers will invariably deny employment and/or hospital privileges based on an NPDB report . . . .").

Summary judgement now, prior to discovery, as to Stacey's claims is premature. Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Plaintiffs' Rule 56(d) declaration identifies several discovery gaps that bear directly on how the Agreements intersect with medical malpractice reporting obligations, including:

- documents referencing, or reflecting, communications between Life[MD] and any third-party during 2023 and 2024 about reporting a malpractice claim related to Brad and/or [Defendant's] treatment of Brad to any relevant federal or state authority;
- documents referencing, or reflecting, communications between Defendant and any third-party during 2023 and 2024 about reporting a malpractice claim[] as part of a settlement between Life[MD] and any other party;
- documents and communications referencing, or reflecting, communications between Life[MD] or Defendant with any third-party

11

- concerning reporting or documenting any medical malpractice claim or settlement concerning Brad Roberts to any federal or state authority;
- policies and procedures related to the handling of medical malpractice claims by Life[MD] and its "affiliated network of medical providers"; and
- documents referencing, or reflecting, communications among personnel at Life[MD] or any third-party during 2023 and 2024 regarding notice of any claim related to that was made [*sic*] to any insurance company, together with any such communications with the insurance company.

Defendant, LifeMD or other third parties maintain control over each category of information, and none have been produced to date. Courts "may void an agreement only after balancing the public interests favoring invalidation of a term chosen by the parties against those served by enforcement" and should do so only where the agreement "clearly contravene[s] public right or the public welfare." *159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 133 (N.Y. 2019). Because the current record cannot resolve whether the Agreements operated, in effect, as malpractice settlements structured to evade mandatory reporting, discovery is warranted. Summary judgment is denied without prejudice and without reaching Plaintiffs' remaining arguments.

### D. Motions to Strike

On February 28, 2025, Plaintiffs moved to strike four categories of material submitted with Defendant's reply -- statements in its memorandum of law, portions of Eric Yecies's declaration and Exhibits A, C and D to that declaration -- arguing that the materials are either unsworn, unauthenticated or exceed the Court's page limits. On March 10, 2025, Defendant responded seeking to strike Plaintiffs' letter motion as an unauthorized surreply.

Plaintiffs' motion to strike is denied. Whether to grant or deny a motion to strike is vested in the trial court's sound discretion. *See Hollander v. Amer. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000);

12

*accord Schneidermesser v. NYU Grossman Sch. of Med.*, No. 21 Civ. 7179, 2024 WL 4054372, at *1 (S.D.N.Y. Sept. 5, 2024).  Because the challenged evidence or statements were not credited and Defendant's motion for summary judgment was denied, Plaintiffs' letter motion is moot. *See Montgomery v. N.Y.C. Transit Auth.*, 806 Fed. App'x 27, 30 (2d Cir. 2020) (summary order) (affirming denial of motion to strike because court did not rely on challenged evidence); *Sec. & Exch. Comm'n v. Mattessich*, 523 F.Supp.3d 624, 633 (S.D.N.Y. 2021).

Defendant's letter motion to strike Plaintiffs' filing as an improper surreply is granted. Surreplies may not be filed without prior leave.  Plaintiffs' February 28, 2025, letter, though styled as a request for a pre-motion conference on Plaintiffs' anticipated motion to strike, both responds to Defendant's arguments and advances new ones.  Plaintiffs dispute Defendant's assertion that "Plaintiffs submitted no evidence to demonstrate Brad's lack of capacity" and counters the reply's claim that Plaintiffs "admit that Defendant is within [LifeMD's affiliated] network."  "If a party files a document responding to the substance of the other party's reply in support of its motion, the Court will construe the document as a sur-reply."  *Diallo v. New York City*, No. 23 Civ. 1238, 2025 WL 522514, at *5 (S.D.N.Y. Feb. 18, 2025) (collecting cases). Such an unauthorized surreply is procedurally improper and will be struck from the docket.  *See id.* at *7 (striking letter brief filed without leave).

### IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED** without prejudice to renewal following fact discovery, except as to issues decided on this motion -- i.e., the unambiguous scope of the releases, and Brad Roberts's capacity when the Agreements were signed, which is a question of fact.

Plaintiffs' motion to strike is **DENIED** as moot as this Opinion does not rely on the challenged materials. Defendant's motion to strike Dkt. No. 39 as an improper surreply is **GRANTED**.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 23 and to strike Dkt. No. 39.

Dated: September 25, 2025
      New York, New York

                                                LORNA G. SCHOFIELD
                                      UNITED STATES DISTRICT JUDGE